Yes, your honor, the final case on the docket is case number 22-25F0302 Harris, North America, Queensland Defined Title I.A. Trust Company, et al. Defendant William C. Graft, et al. Crossed third party plaintiff's appellant Michael J. Graft, Jr. Individually, Crossed Defendant Appellee Michael J. Graft, Filbert, Inc. Third Party Defendant Appellee Arguably, on behalf of the appellant, Mr. Daniel F. Connick Arguably, on behalf of the appellee, Mr. Adam J. Fidler Thank you. Mr. Connick, you may proceed. Good afternoon, your honors. May it please the court, counsel, Mr. Graft. This case is before the court today after a bench trial. And I understand and I appreciate the manifest weight of the evidence and the type of standard that is applied in this type of case. And the trial court in this case did write a 52-page opinion, very in depth. But the fundamental flaw, I think, that changed the entire opinion was the way she construed the Mr. Maroos testimony. Before you get to the merits and to the testimony, could you address the jurisdiction issue? There's a gap in your opening brief in the facts section spanning almost 10 years, from 2015 to 2024. How are we supposed to ascertain our jurisdiction when your facts section doesn't account for most of the underlying procedural history of the case? Justice, the underlying procedural history is set forth in the table of contents. And to be frank, there is no history other than appearing for status, after status, after status in Cook County. The trial portion of this case, Justice, had nothing to do with what occurred when the case sat over in Cook County for that time period. The second part, the reason it took so long to get the trial, is there was an intervening bankruptcy. So as it relates to the trial record, the trial itself, that 10 years does not account for any jurisdictional issue. The only portion that was, and we addressed it in our brief, relates to the Cook County trial court's order on that motion for Lee to file the Third Amendment complaint. And as we pointed out in our brief, when the case was transferred back from Cook County to Lake County, it had obtained that new CH number and everything was put, all these cases were put into this 62CH. So we're able to succinctly trace how the combined actions evolved from the initial foreclosure through this appeal? Yes. And again, the proceedings through the foreclosure, as they relate to the trial, were very discrete issues, Justice. They came up in trial exhibits, the ruling by the trial court on the foreclosure in August 2014, the ruling by the trial court as it related to what we've dubbed or called the secret agreement, the order allowing us to obtain that document. So very discrete issues as it relates to, was it a voluminous and frankly confusing record with all the numbers. And I concede it was difficult to go back and go through it and put it together, but we did. We did it not once for the trial court, but we also did here. So I think jurisdictionally, we filed a timely notice of appeal as it relates to both, obviously, the trial court order, the judgment order. That was timely. And also, and importantly, relating to that trial court order in Cook County that denied leave to file that Count II, which would be the Fort Pierce claim. And that's clearly set forth in the briefs as to how, when it came back to Lake County, at defendant's request, everything was merged into that new case. And then as we cited in the 540 North case, once everything was merged into that new case, there could not be an appeal because there is no final and appealable order until the resolution of the trial. You argue in your brief that the proposed third amended complaint was timely because you filed it during the pleading stage. Is that the end of the analysis? No, not at all. In fact, if, and I have the Loyola case here, the other factors is whether the proposed amendment would cure the defective pleading. There's been no argument raised that there was a defective pleading in that third amended complaint. And the third amended complaint, Justice, is set forth in the record at C6136 through C149. But in particular, the pages relating to the individual claim that William had for the breach of fiduciary duty of his brother is relating to the Fort Pierce property in Florida. That's contained in a very succinct Count II within those pages. And it pleads, the allegations plead fiduciary duty. They plead what was undertaken by William and his brother in order to investigate that Fort Pierce property. They plead the allegations regarding his brother's denial that he ended up purchasing the property without telling his brother about it. They plead about his brother's denial and lie about what he purchased the property for. They plead about how his brother took that property and put it into a trust, a secret trust that we ultimately uncovered during the course of the litigation relating to Tallgrass. So that count under the proposed amendment portion of the Loyola factors pled a cause of action. The second factor- Can we just ignore the two-year delay in filing? No, no, I don't think you can. And that's why I talked about Loyola, the Supreme Court case. In Loyola, there was a similar delay, Justice. In fact, the delay there came after a dispositive motion. A summary judgment had been granted. And what's our standard of review on this issue? It is- It's used in discretion. Sure, it is. But, Justice, that's just one factor. And the Loyola case made very clear that in assessing all of it is whether or not there's a surprise or prejudice. The way that Cook County case was prosecuted, it sat dormant. Except going in for status, after status, after status. There was no dispositive motion. There was no discovery. There was nothing that would cause anybody on the defense side, the court side, the plaintiff side, prejudice. And, Justice, that was one of the things. Because I think that was the same problem that the Supreme Court saw in the Loyola Academy case. And it specifically said, when you look at those opportunities to amend in the time frame, you have to also look at it in light of the other factors. And was there, one, prejudice, but, two, had there been an intent before that to file? Here, our intent was clear from the beginning. It was filed in the Lake County portion of the case before it was transferred to Cook County. It was filed in a second amended complaint in Cook County. So, like Loyola, the intent from the beginning was always to prosecute it. But I acknowledge, Justice, that that's an issue. But I think all the other factors under Loyola and the fact that there is no prejudice, and, frankly, there was no reason other than an arbitrary decision by the court not to allow that amendment, especially in light of the fact that it was going to be transferred back to Lake County. Why is the second amended, it's a cross-claim, right? A third-party complaint? Do I have that right? It was a direct claim, Justice. So it was part of the initial pleading filed, 14L, in Lake County that ended up in Cook. And it was under count two. And it was a direct cause of action by William Graft against his brother arising out of that one piece of property that they looked at in order to invest in. And so it was from the very first, and it's in the record, from the very first 14L, went to Cook County, received that new number. It was in a second amended complaint, and then the proposed third amended complaint. So, wait, 14L original complaint? It started in Cook. I'm sorry, it started in Lake. And then made its way to Cook, and they gave it a new number. And then you had a first amended at some point. It was a first amended. It was dismissed. And that's where Justice Burkett asked that two-year gap, where the court said you can amend, and then there was the two-year gap. So help me understand. How long was between the dismissed complaint and the refusal? Two years. Two years. And I guess the only thing I'm not 100% sure, like status after status after status, let me just finish, is mitigating delay when you're the claimant. I'm not sure how that's, you know, do the courts say to themselves, well, if nothing's going on, then it's okay for nothing to go on for another couple years? So I can explain. The Cook County case was actually a case that was under 12L, and it was being prosecuted by Michael as the plaintiff against William. So Michael was the plaintiff in that case. The court in Lake County thought that this Fort Pierce should be part of that because they were substantially similar. So it sent that portion to Cook County. So there was both of the brothers theoretically prosecuting cases against each other.  Well, the claimants, yes. Right. Yes. So. And you don't control the opponent's claim. Exactly. And I'm understanding that. Right. But what I'm suggesting is you do control your own claim and, you know, on some level the timing of things. And I hear you saying, well, there wasn't much going on, so some time lapsed. Yes. And that's mitigating for the delay. Mitigating isn't the word I would use. I would use it in the context of how the Supreme Court in the Loyola case factored that. In the Supreme Court when it factored this, what we're talking about is the time period. It definitively said one of the issues to look at is whether or not there was any prejudice. And based on this record, there is zero prejudice, none. I understand that. I just want to make sure I understood your argument. That's my argument. That the delay should not be held against the person asking for an amended pleading. Under these circumstances and under 616. I think I understand it better now.  Under 616, and the Supreme Court made clear, but the legislature is that you want to do justice among the parties. If there was an injustice about that delay, it would have been in these briefs. There was no injustice. Going back to the trial itself, the Maroos testimony, and this is where I think the court went astray in terms of its analysis, the method in which it analyzed the case. The Maroos report did not come into evidence, as the court said, and therefore she said page 26 of that report had a lot of information in there, but page 26 wasn't in evidence, and Mr. Maroos' testimony was limited on certain topics. The Maroos report was support for Mr. Holowicki and Mr. Gellis. We could have tried that case without putting Mr. Maroos on the stand. It was Mr. Gellis and Mr. Holowicki that were using the report, as they said in their business as financiers and bridge lenders and accountants, is that they use, in fact, Mr. Gellis was very clear, they use reports, appraisal reports, in order to determine whether or not they're going to zone in on a piece of property, in this case the land development in Barrington Hills. The number one piece of evidence that they look at, according to Mr. Gellis, is that appraisal report. I could have simply, and Mr. Gellis had it, put Mr. Gellis on the stand, did you rely on a report? Is that the type of report that you reasonably rely upon in reaching opinions in this case? Not only opinions in this case, but opinions on how he's going to operate his business. So I think the court, with all due respect, did not understand that, that the Maroos report was not a tool for the court to decide damages. It was a tool for Mr. Holowicki and for Mr. Gellis to decide whether or not there would have been a bridge lender who would have found this appealing under the circumstances of this case. So when the court went into the fact that, well, the Maroos report didn't take into account that there was foreclosure, the Maroos report didn't take into account that there were liens, the Maroos report didn't take into account that there were other factors that would have come into play, each Mr. Gellis specifically testified in the record that the foreclosure would not have been an issue as it related to this self-funding project. And that's at record page 396, page 485, where he made that clear. Mr. Maroos explained in his testimony that the purposes of his report was to show what a new buyer, what a new buyer would do under the circumstances. And he specifically explained in the record at page 224 through 225, the new buyer, by definition, once they came up with the money to pay off the bank's loan, would have it free and clear because the bank would be paid off under those circumstances. So the encumbrances and the liens would all be taken care of. They would not be an issue to the bridge lender under those circumstances. That's the whole purpose of the bridge loan. Any questions? Thank you. You'll have an opportunity to make your vote. Mr. Finlay? You may proceed. Good afternoon, Justices. Good afternoon. Actually, it's two minutes before according to the clock on the wall. I looked at my watch to make sure I was supposed to sneak that one in. First, I'd like to address what the court noted was kind of a complicated history with the Cook County case. So there were a number of cases that were filed. The case numbers were referenced. The first case number was 12L693. That was a Cook County case for which Michael J. Excuse me. Michael J. Graff Builder was the plaintiff. And excuse me, MJG Construction was the plaintiff. Two counts. One was for a $123,000 escrow account related to a Lot 53. That claim was resolved on summary judgment. There was a second claim for breach of fiduciary duty brought by MJG against Graff and Jordan related to legal services that were performed. The second case that was ultimately consolidated with that case in Cook County did start in Lake County as 14L588, then was transferred to Cook County as 15CH1846. Is this laid out, the history laid out in your brief? I believe we did address this history. What I can do, I'm going to give you some citations to some points in the record which show what subsequently occurred. In your brief, you argue that we may lack jurisdiction over certain aspects of the appeal. Correct. But you don't provide us any argument or develop any points along those lines. Well, our argument in that respect is that you have the Cook County case, which a couple of those three case numbers, which ultimately gets transferred to Lake County as 22CH64. The dismissal orders that you're discussing, you were discussing with my colleague, were related to the dismissal of the second amended complaint, which was in the record at C5998, Volume 4. There was an order entered on July 12, 2016, which dismissed the second amended complaint, which included three counts. The first count was for breach of fiduciary duty as a derivative claim against Michael Graft on behalf of Tallgrass. The second count was the Fort Pierce claim, a breach of fiduciary duty claim, which is what's at issue in the appeal. And the third count was an aiding and abetting complaint against Michael J. Builder and MJG Construction. So those are all part of the second amended complaint, which was dismissed with leave to reply, with leave to refeed. And that order dismissing that second amended complaint gave the appellant until August 9, 2016, to file their amended plea. They waited until August 9, 2018, to file a motion for leave to file the third amended complaint. So that's the two-year gap. And in that, in the ruling on that order, which is the order in the record 00053, they were denied leave to file a third amended complaint with respect to all three of those counts. And the reason for that denial was that counts 1 and 2 had already been repled in the Lake County claim. And so in the court's order, they say, we're denying you leave to file because those claims have already been filed in Lake County. The second claim, with respect to Fort Pierce, was denied with prejudice. And I heard some arguments about there was no delay or any prejudice with respect to that count, and that it was, I suppose, timely because there was a series of status hearings. When the leave to file the third amended complaint was denied and an order was entered, it was almost immediately transferred for consolidation into this case, 09CH4358. The two counts, 1 and 3, were already repled and were already being pursued. At no time did the appellant take any action to try and replead the Fort Pierce claim in 09CH458. In this case, the Fort Pierce claim is qualitatively different than all of the claims that were pending in 09CH4358 insofar as all of those claims related to the Tallgrass property. The only claim that was tried was a derivative claim on behalf of Honeybee and an exclusive for breach of fiduciary duty against Michael. And the claim that was abandoned in Cook County for denied leave to refile in that case and then abandoned for years and years and years was this Fort Pierce claim. So to the extent there was no action on it, it's the fault of the proponent of that claim. They could have tried to take action in 09CH4358 to bring that Fort Pierce claim in. They did not. They entirely abandoned that claim and nothing was said about it again until an appeal was filed. Now, what you're referring to in our argument was a subsequent agreed order. The basis of our argument here is that not only was that claim, leave to file that claim was denied, not only was it abandoned for several years, but on March 23, 2022, as we're going into trial, the parties entered an agreed order that said all claims originating in 22CH64, and I don't mean to make it complicated, but recall that that's the consolidated case number which included the claims that were brought by MJG and the three claims from the 15CH1846 case, all claims originating in 22CH64 are voluntarily dismissed. So they were denied a motion for leave to file. They took no action for two years. They filed a motion for leave to replead. That was denied. The case or that claim set, laid foul. They took no action on it. There was no discovery taken on it. It was never pursued. And then in 2022, they voluntarily dismissed that claim. So our position is that the court doesn't have jurisdiction because of that voluntary dismissal. In addition to the other elements, which I am responding to my colleague making arguments about timeliness and so forth, those elements can't be satisfied either. This wasn't a timely complaint or a timely attempt to refile this claim. They waited two full years after the court's initial order, giving them leave to replead, did nothing about it, and then pursued counts one and three in the 09CH4358 case. I feel like I should pause there to see if there's any questions on that history. No? With respect to the two additional bases for an appeal, my colleague is right. It is a manifest weight standard for both claims. Their claim with respect to the expert's opinion, while I'm hearing their theories now that they could have just simply offered Mr. Gellis and Mr. Hellowicki to offer testimony, the court threw in their judgment order a careful recitation of all of the evidence that was presented. And with respect to Mr. Gellis and Mr. Hellowicki, both of those opinions rely on Mr. Marouse's opinion. One of the opinions was that a discount would be available from the Harris Bank debt, and that discount was available because there was equity remaining in the property. Some substance of the equity component of that opinion is the Marouse underlying appraised value. In fact, both experts say that they relied on the appraisal report in order to create their opinion. What the court noted in her opinion with respect to Mr. Marouse's opinion is that he used a comparative sales analysis, but there was no specificity with respect to what properties the comparison was being based on. The evidence that was presented was that there was 11 comparable sales, but there was no specifics offered to the court in order to consider whether or not those sales were reliable insofar as the court could rely on that underlying appraisal opinion. And significant to that appraisal opinion and the subsequent opinions that relied upon it was that there was an acknowledgment that a mortgage foreclosure action, especially a mortgage foreclosure action that had been pending for approximately six years on the date of value, would have significant impact on the value of these properties. And the court also acknowledged, and I don't think it's any mystery, that this was a time in our nation's history where the economy was literally crumbling. Every piece of real estate, including the piece of real estate at issue here, was substantially impacted by the credit default crisis with the mortgage crisis. All of the experts acknowledged that that reality, that economic reality, was substantively important for the foreclosure that took place here. And I think that one issue that should be also acknowledged is that we have three loans here that were foreclosed upon by Harris Bank. There was a $8 million loan for the purchase of the real estate, and there was a $7.7 million loan and a subsequent $1.2 million loan. The first was a loan to Exclusive. The second was a loan, were loans to Honeybee. I have that reversed. I apologize. The first was a loan to Honeybee. The second two were to Exclusive. Those loans were issued in June of 2006. The two large loans, the $8 million and the $7.7 million loan, were both due on June 15, 2009. The third loan was $1.2 million, and that loan was due on June 15, 2007. The foreclosure was filed, and the case that was filed by Harris Bank, only alleged defaults on those three loans. And at the time that that foreclosure was filed, several significant facts that were noted by the judge are that at that time, in excess of $13 million was owed, was past due, and was not being paid. And in the intervening period between 2006 and 2009, a 71-lot subdivision had only generated seven sales of lots. These entities were created to develop a subdivision, entitle a subdivision, and market the lots for sales to eventual developers of bespoke houses. For six years, there was no trans- well, there was meaningfully very little transactions with respect to those lots. Several of the transactions that did occur were to family members of the two principals here, the parents and siblings of Mr. William Graft and Mr. Michael Graft. The court acknowledged all of these issues in her opinion, considered all of these issues in their opinion, and when addressing the valuation opinions and the secondary financing opinions offered by Mr. Maroos, Mr. Gellis, and Mr. Holowicki, noted that their assumptions of equity, they're dependent on an appraisal that lacked evidentiary basis. Their opinions based on velocity of sales, which were 1.3 houses per month, were utterly unsupported. You have six years of transactions with seven transactions, two of which are to insiders. The history of the site was not 1.3 sales per month. It was one sale per 12 months. And the court noted all of those things and said that the- well, she acknowledged that there was a secondary loan that was also in default by Mr. Graft. The proximate cause of the default here was the economic crisis that affected all of the real estate. It was based on- and that conclusion, that factual conclusion, was based on the facts specific to this site. It simply didn't have a velocity of sales. They owed substantial assets. And even in 2008, one of the issues that the court noted is both of these individuals signed a membership contribution of interest in 2008, which is both prior to the alleged default of Mr. Michael Graft and prior to the filing of the complaint by Harris Bank and also prior to the 2012 agreement by some number of years, both parties acknowledged that the membership interest of Honey Bee was zero- the value of that was $0. And Honey Bee, its only asset was a beneficial interest in a land trust, which held the real estate related to this subdivision. So with that, I'll stop to see if there's any questions. But for those reasons, we would ask that the trial court's opinion be of help. No, thanks. Thank you, sir. Mr. Konasek, you may proceed. Thank you, Justice Burkett. Our reply brief, page 9 through 11, sets forth the history that you're looking for. In particular, on page 10 of the reply brief, it references that order where the court consolidated the 22CH64 with the 09CH4358. That is, on page 10, the record is C6067 through 68. When it consolidated those two cases, the 09CH and the 22CH cases, it said, for all further proceedings. And that's important because as of that time, the only thing we had was an order from the Cook County judge saying, we're not going to let you replete or file the amended complaint. Once that order was entered in Lake County, combining those cases, and there was a voluntary dismissal of all the remaining counts, except for the one that was tried, that could not be appealed. Once it became part of the consolidated case, if we would have filed an appeal, it would have been sent back because this court would not have had jurisdiction. And that's the 540 North case that we cited there. It's directly on point. The other part I want to address is they said we abandoned because we didn't try to do anything when the case was sent back to Lake County. Under the Viola factor, that is not even an issue. That argument has never been raised. And there's nothing to say that a court in Lake County would reverse a judge in Cook County. The only thing we could do is do exactly what we did here, understand what the appellate court rules are, and that's not a final and appealable pleading until that remaining count was tried by the court. So we did not abandon. We waited to appeal what we believed to be was an order that was an abuse of discretion that did not follow the Viola factors. So that takes me back. So the counsel's claim that you could have asked for relief in Lake County? I think I could have. I mean, I could go and say, hey, undo what the Cook County judge did, but I don't think that's an obligation under Viola. And frankly, I don't think the trial courts are prone to do that because they're not reviewing courts. So could something have been done? I also would point out in the circumstance of that, if it was abandoned, they said, if you look at the record here and when it came back to Lake County, the number of extensions that Michael requested, he let go of the law firm trying to get an extension so he could name experts, so he could name witnesses, so he could continue the trial date. The record reflects that they did that over and over. On the day before this case was supposed to start trial, he filed bankruptcy. So this is not a case of us abandoning or not pursuing. It's using the rules the way they were drafted by the Supreme Court of when we can appeal a trial court order. And that's what we did. But the other point I want to address is this. Is there any merit to counsel's claim that you failed to promptly amend during the time the trial court gave you and instead waited two years? And I was waiting to hear the part that Viola said. Was there an intent? Clearly there was an intent we expressed from the beginning to file, so that's irrefutable. And then prejudice. There's not one thing he told you that's contained in this record that Michael was somehow prejudiced as a result of that request or would be prejudiced as a result of that request. There is nothing. So we boil down to Justice Burkett and Justice Mullen. The one question you both asked me is what about that timeliness factor. And I think under Viola, if we apply that standard, And again, the Viola case was after a dispositive motion, months, years after, well, the case had been pending for years. The dispositive motion was entered, then 60 days later they sought leave to amend. So they had many opportunities likewise, but the court said it's going to do justice under the circumstances. And I think that under these circumstances, that would be the just outcome here. The 10 seconds. In weighing the testimony of Holwicki and Gellis, is it Gellis or Jealous? Gellis, I think. The trial court commented that Maroos mainly referenced Cook County properties. Do you want to comment on that? I do. So Mr. Maroos used what properties he could, and there were Lake County properties for McHenry and Cook County. So I completely agree. Can I continue or do I want to stop? The point is, is Mr. Maroos' report, the audience, you know, was Mr. Gellis and Mr. Holwicki, to say whether or not this was a viable bridge loan finance. And so the entire report had been reviewed by each of them, and they took the position based on not only Mr. Maroos' reputation, they testified both to that, but also the report itself, that there was enough there to say what $15 million was owed, we got a project that is $29 million. Even if it's off by a million or two, the delta of after taking out all the expenses, the carrying costs, everything, you're still looking at a 5.2, I'm sorry, $5.8 million profit. That's after the 12% that goes to the bridge lender. So the bridge lender is the one that's looking at it and saying, is this a risk? And both of them said this property was not a risk. They did the risk ratio. And so for those reasons, I just think that the court mistook what the purpose of the Maroos report was. It was not the basis for her to say whether or not there were damages. It was a tool that both Holwicki and Gellis needed. And she said both of them were very credible in the circumstance. And last thing, that's why you needed the experts. And under 703, this type of testimony about refinancing and bridge loans in that time of 2012 was something only experts really could comment on. And we were the only ones that had the experts. I appreciate your time, and sorry for the confusing record. No more questions. Thank you. We will take the case under advisement.